■ In the Matter of Commissioner of Social Services of the City of New York, as Assignee of Jeanette M., Petitioner, v Jose M., Respondent. Nancy Botwinik, Esq., as Law Guardian, Appellant. [781 NYS2d 640]—

Order, Family Court, New York County (Lisa Friederwitzer, Ref.), entered on or about March 12, 2003, which granted respondent father's motion for genetic marker tests, unanimously reversed, on the law, without costs, and the motion denied.

Petitioner's assignor (petitioner) and respondent were married on February 24, 1984 and were still legally married as of October 8, 2002, the date on which petitioner testified at the hearing in this matter. During the marriage, petitioner gave birth to three children: Michael, on September 30, 1984, Thomas, on December 31, 1987, and Daniel, on May 13, 1990. Respondent's challenge to the paternity of the two younger children is the subject of this appeal.

On February 15, 1991, the Commissioner of Social Services filed a petition requesting that an order of support be entered for the three children. Four years and various proceedings later, on January 4, 1995, a final order of support, which contained an adjudication that respondent was the noncustodial parent of Michael, Thomas and Daniel, was entered in the amount of $166

per week. On December 4, 2001, respondent moved for genetic marker tests for Thomas and Daniel, who were then 13 and 11 years old, respectively, and to vacate the January 1995 order of support.

At the hearing on the motion, respondent testified that he could not recall the date or year that he and petitioner met or were married but that they lived together for only six months after the marriage and thereafter saw each other approximately twice a month "in the street." He said that after he and petitioner separated in 1985 they never again had sexual relations. Respondent could not recall either Thomas's or Daniel's birth date and he denied reuniting with petitioner before the birth of either child. He said that he knew when Thomas was born that he was not the boy's father because he had had no relationship with petitioner during the relevant period.

Respondent testified that he had seen the children only seven or eight times in his life, the first time being when Thomas was approximately four years old and Daniel approximately two. He maintained that Thomas and Daniel had never been to his home, that he had never been to their home to visit or spoken to either of them on the telephone. He said he had only seen Thomas by coincidence, such as when they met at a public swimming pool or at McDonald's.

Respondent testified that a coworker told him in July 2001 that he, the coworker, was Thomas's father and had been paying child support for Thomas since the child's birth. Respondent said he called petitioner, who told him that the children were not his, and he moved for DNA testing because he wanted to learn the truth about Thomas and Daniel since the court had ordered that he support them. Respondent stated that from the day the children were born he knew they were not his biologically because he had had no sexual contact with their mother. However, he said that when the original petition was filed against him in 1991, the hearing examiner told him that as long as he was still legally married to petitioner he was responsible for the children. Although he had requested DNA testing in or around 1993, he did not follow through on this request because he believed the judge would deny it on the ground that he was still legally married to petitioner.

Respondent's fiancée also testified at the hearing. The referee found her testimony regarding respondent's relationship with the children to be "self-serving and lacking in credibility."

Petitioner testified as to her marriage to respondent and their various separations and reconciliations in the first six years.

She said that when they reunited in June 1987, about six months after their second separation, she was pregnant with Thomas and respondent knew he was not the child's biological father. They decided that they would raise the child together, that respondent would act as the child's father and that when the child was old enough they would tell him the truth. Respondent signed Thomas's birth certificate knowing he was not Thomas's biological father.

Petitioner testified that she and respondent separated again twice in the next two years and, in 1989, when they reconciled again, petitioner was pregnant with Daniel. Again, respondent knew he was not the child's biological father but wanted to raise the child as his own. He was not only listed on Daniel's birth certificate, but he also named the boy after a deceased friend. According to petitioner, between September 1990, when she and respondent separated again, and 1992, respondent visited her and the children and he and petitioner engaged in sexual intercourse. Respondent's contact with the children diminished in 2000, after he became involved with his fiancée.

Approximately a year and a half before the hearing took place, after respondent had ceased all contact with the children and in response to their questions about their physical features, petitioner told the children that respondent was not their biological father. She also told them the names of their biological fathers, but neither father is involved in his child's life.

According to petitioner, the children are very hurt that respondent has stopped visiting because they love him and he is the only father they have ever known. She said that, contrary to respondent's claims, he had a great relationship with both boys and they viewed him as their father. She described respondent's relationship with Thomas and Daniel as closer than his relationship with Michael, his biological son. She said that all three were named as beneficiaries of respondent's employee death benefits policy. Petitioner testified that starting in 1995, when she moved to New Jersey, the three boys spent weekends with respondent in the Bronx, and that from 1995 until 2000, they went there nearly every other weekend. Then, at around Thanksgiving of 2000, respondent stopped spending time with the children. He had become serious about his fiancée.

Petitioner testified that respondent had sent the boys birthday cards and birthday and Christmas presents, that he had taken them on vacations and to spend time with his other son, Kevin, and that he had been listed at one time as an emergency contact at the boys' school and had gone on one occasion to speak to one of their teachers. She denied that respondent's coworker was Thomas's father or that he ever paid her child support.

Thomas and Daniel were interviewed by the referee in camera. Daniel, then 12 years old, told the referee that he no longer called respondent Dad because his mother told him that respondent was not his father. He had always believed that respondent was his father and was very upset when he learned otherwise. Daniel described his relationship with respondent as a good one. They talked about cars and he helped respondent work on his car, and they enjoyed going out together for pizza. He said that until he was 10 or 11, he, Michael and Thomas saw respondent every Friday and slept at his house, where respondent lived with Doris and his son Kevin. Daniel told the referee that he was angry at respondent because he had heard that respondent no longer wanted to have anything to do with him.

Thomas, who was 14 at the time, told the referee that respondent was lying to the court about their relationship. He said respondent had taken care of him and his brothers. Respondent took them on vacations, to the beach and pool, camping and biking together, and to his house. He said respondent changed about a year before the hearing, when he met his current girlfriend and decided that he no longer wanted anything to do with Thomas or Daniel. Before that, Thomas, Daniel and Michael saw respondent once or twice a month, usually on weekends, when respondent either picked the boys up or stopped by to visit.

The referee granted respondent's motion for genetic marker tests. In her decision, she stated that the court "can no longer protect Thomas and Daniel from finding out about this controversy or that another man may be their father. This was a decision made by Ms. [M.] alone, without the permission of or discussion with the Respondent or the Court. They have been told that the only man that they have known all their lives is not their father . . . . At this time they are virtually left without a father." The referee found that it would be in the children's best interests to provide them with closure by resolving the question of who is their father. She found that if the results of the tests do not exclude respondent, there is still time for the children to repair and rebuild their relationship with him, and if the results do exclude him, the children can seek out the men whose names petitioner has given them and seek to form a relationship with those men.

We find that genetic marker tests are not in the best interests of the children and therefore reverse.

The Family Court Act provides, in pertinent part, that when paternity is contested, the court "shall order the mother, the child and the alleged father to submit to one or more genetic

marker or DNA marker tests of a type generally acknowledged as reliable . . . to aid in the determination of whether the alleged father is or is not the father of the child. No such test shall be ordered, however, upon a written finding by the court that it is not in the best interests of the child on the basis of res judicata, equitable estoppel or the presumption of legitimacy of a child born to a married woman" (Family Ct Act § 418 [a]).

As the record discloses, for 14 and 12 years, respectively, Thomas and Daniel were treated as children of petitioner's and respondent's marriage. Respondent was named on the children's birth certificates and agreed to raise them despite his knowledge that they were not biologically his, he supported them financially, regularly visited them, encouraged the development of a father-son relationship with each of them, and held himself out as their father. As the referee recognized, the boys regarded respondent as their father until he decided to sever their relationship when he become involved with a new girlfriend, and they were devastated by his sudden withdrawal from their lives.

Under the circumstances, respondent should be equitably estopped from pursuing his paternity challenge (*see Richard B. v Sandra BB.*, 209 AD2d 139, 142-143 [1995], *lv dismissed* 87 NY2d 861 [1995]). Moreover, given the presumption of legitimacy, he should not be permitted to have the children declared illegitimate for the sole purpose of furthering his own self-interest by avoiding child support obligations (*id.*). While continuing uncertainty as to the identity of their biological fathers will have an impact on the children, the desirability of their knowing with certainty is not sufficient to overcome their loss of the "rights and status attached to legitimacy" (*id.* at 144).

Moreover, testing would confer little benefit on either of the children and "in the final analysis it is the child[ren]'s best interests which are paramount" (*id.* at 143). As the referee noted, their mother told them that respondent was not their father after respondent severed his relationship with them. Both boys were hurt and angered by respondent's withdrawal from their lives and his apparent desire to have as little to do with them as possible. The harm has largely been done. Moreover, while the referee stated that the children could pursue relationships with their biological fathers, there is no evidence in the record as to who the children's biological fathers are or whether they were notified of their paternity, much less whether they would be willing and able to assume a paternal role in the boys' lives. At the same time, the referee recognized that there is still time for the children to repair and rebuild their relation-

ship with respondent. On balance, we find that the children's best interests will be served by maintaining their legitimacy and thus by denying respondent's motion for genetic marker testing. Concur—Nardelli, J.P., Ellerin, Williams, Lerner and Catterson, JJ.